MANION, Circuit Judge,
concurring.
It started as a simple arrest warrant. But at the last moment, the prosecutor suggested the judge add some language. So, on the bottom of the warrant, the judge scribbled
[a]s further condition of bond, Defendant, Thomas Swanson is directed to turn over any firearms in his possession + control to the Hinckley or Sandwich police department.
This turned the arrest warrant into something more — it is unclear what. It maintained the essential character of an arrest warrant, but with that additional language it had the added effect of being a mutated subpoena duces tecum, conditioning Swanson’s right to bond on the production of incriminating evidence. While it is unclear if this complies with Illinois law, it is clear that this order created a penalty situation where, by exercising his Fifth Amendment rights, Swanson would be punished by being denied bail. For that reason, I would suppress the gun and Swanson’s confession.
The Fifth Amendment provides, in relevant part, that no person “shall be compelled in any criminal case to be a witness against himself.” This protects a person from being called to testify against himself at his own trial and permits him to refuse to “answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.” Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). If a person wants to exercise this right, he must assert it. Swanson did not, and normally this would keep him from claiming the protection. But that failure is excused when a person would have been punished if he exercised his rights. This is commonly called the “penalty exception.” Minnesota v. Murphy, 465 U.S. 420, 439, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). When this occurs, the defendant’s failure to assert the privilege is excused, his answers are deemed compelled, and they are inadmissible in a criminal prosecution. Id. at 435, 104 S.Ct. 1136. In most penalty-exception cases, a person is forced to testify with the threat of some sort of economic sanction.[3]
The seminal case on this issue is Murphy, despite the fact that in that case the Supreme Court found that the penalty exception did not apply. In Murphy, the defendant had to participate in sex offender treatment and be truthful with his probation officer “in all matters.” During one *1006 treatment he admitted to a rape and murder he had committed years earlier. This was reported to the probation officer, who met with Murphy and reminded him about the conditions of his probation. Murphy then confessed and he was later charged with murder. The Supreme Court held that the requirement to be “truthful in all matters” with the probation officer was no different than a subpoena before a grand jury that the defendant always tell the truth. In the grand jury context, it is well established that while a defendant must always be truthful, he can always invoke his Fifth Amendment rights. Thus, the Supreme Court held that it was unreasonable for Murphy to fear that he would be penalized for taking the Fifth when talking with his probation officer. See also United States v. Cranley, 350 F.3d 617, 622 (7th Cir.2003) (finding no penalty exception under near identical facts as Murphy ). In this context, “a fear is unreasonable when it flies in the face of settled law.” United States v. Ollie, 442 F.3d 1135, 1139 (8th Cir.2006). Thus, we look to the bond order to determine if it would cause Swanson to fear that he would be punished for exercising his rights, and we look at our precedent to determine whether that fear is reasonable.
Here, the bond order was unusual — to say the very least. A hasty suggestion by the prosecutor, it was scrawled at the bottom of the arrest warrant and conditioned Swanson’s bond on him turning over his firearms. Swanson probably assumed that Sgt. Ford knew about the other firearms. After all, Sgt. Ford knew that Swanson was planning a bank robbery, and although some banks are robbed without a gun, normally one is used. And the gun that Swanson was charged with having was confiscated by Sgt. Ford a year earlier, so Sgt. Ford was obviously not looking for that one. For his part, Sgt. Ford used the order as an effective tool: as the court emphasizes, at three different points during the arrest, he reminded Swanson of his need to comply with the bond order. The order’s coercive power was also not lost on Swanson: before “spontaneously uttering” where the shotgun was, Swanson prefaced his statement with the fact that “he wanted to fully comply with the court’s order.” Clearly Swanson wanted to comply with the order because he wanted to be released on bond, and he felt that if he didn’t comply he wouldn’t be released on bond. It bears noting that the crime Swanson was arrested for was a misdemeanor, and under Illinois law he had a right to receive bond. 430 ILCS 65/14(a) (first FOID violation constitutes a misdemeanor); ILCS Const. Art. 1, § 9; 725 ILCS 5/110-4 (right to bond). Had Swanson produced any other firearms, they would have been evidence of a felony. 430 ILCS 65/14(b) (second FOID violation constitutes a felony).
In most penalty cases, the threat is explicit. The person is told: If you invoke the Fifth, you will be punished. The Supreme Court has counseled, however, that a threat does not have to be explicit, it can be veiled: If “the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation.” Murphy, 465 U.S. at 435, 104 S.Ct. 1136 (emphasis added); United States v. Saechao, 418 F.3d 1073 (9th Cir.2005) (finding the order created a penalty situation “although the invocation of the Fifth Amendment is not explicitly prohibited.” (emphasis added)). Here, the order did not state that if Swanson invoked the Fifth, he would not get bond. Such an explicit statement probably would not have been found scribbled at the bottom of such an order, nor is one necessary. Rather, the order here took the form of, “if *1007 you want bond, you must produce incriminating evidence.”
An honest reading of the order suggests that failure to comply would have resulted in no bond, regardless of whether Swanson invoked his Fifth Amendment rights. He had to turn over all his firearms — that’s all the order concerned and that’s all that Sgt. Ford cared about. Thus, it was objectively understandable for Swanson to anticipate that by taking the Fifth, Sgt. Ford would assume Swanson was not complying with the order and bond would have been denied.[4] On this point, it is very telling that Ford repeated the command three times, including after Swanson turned over the initial firearms. In addition, after being alone in the holding cell for forty-five minutes Swanson prefaced his confession that he had another gun in the car with the fact that “he wanted to fully comply with the court’s order.” Thus, the order can fairly be read as a threat to Swanson that if he invoked his Fifth Amendment rights he would not receive bond.
The issue then turns on whether Swanson’s fear was reasonable under our precedent. Cranley, 350 F.3d at 622. Again, this is an unusual order. It is primarily an arrest warrant but with the bond’s condition scribbled at the bottom, it has aspects of a subpoena duces tecum and a search warrant. The stated purpose of the order is that there is probable cause to arrest Swanson and it spells out the conditions for him to post bond. The effect of the flawed order, however, is that Swanson must produce this incriminating evidence, evidence that is normally not turned over by a suspect but gathered by the police when they have probable cause and are armed with a search warrant. Sgt. Ford knew that Swanson did not have a valid firearm registration. So any additional firearms he turned over would be evidence of other crimes, this time a felony offense. In this way, the act of producing the firearms constituted testimonial self-incrimination. See United States v. Doe, 465 U.S. 605, 612-13, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). By complying with the turn-over order, Swanson would concede the existence, and his control, of the firearms. See United States v. Hubbell, 530 U.S. 27, 36-37, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000). And such a testimonial act would, of course, be protected under the Fifth Amendment, if Swanson had asserted his right. Id.
The very unusual order has features of a subpoena duces tecum, but certainly doesn’t qualify for that process. See Fed. R. Crim.P. 17. Yet the testimonial act of producing the firearms is somewhat analogous to the requirement of a subpoena. While Swanson could invoke his Fifth Amendment rights against a subpoena duces tecum, the contours of that right are confusing and not always clear. See Fisher v. United States, 425 U.S. 391, 409-10, 96 S. Ct. 1569, 48 L.Ed.2d 39 (1976); Hubbell, 530 U.S. at 36-38, 120 S.Ct. 2037 (surveying the intricacies that attach to claiming the Fifth Amendment privilege when responding to subpoenas); Baltimore City Dep’t of Social Services v. Bouknight, 493 U.S. 549, 554-56, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990) (same). The intricacies of who may assert the privilege, when it *1008 may be asserted, and what constitutes a testimonial act is probably completely lost on the public. It is certainly not as clear as the right Swanson enjoys to invoke the Fifth and refuse to answer questions examined in Murphy and Cranley. The right to remain silent and to plead the Fifth at trial or before the grand jury is well known throughout our case law and culture. See Dickerson v. United States, 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (“Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture.”). The situation Swanson faced was distinct from the issues examined in Murphy and Cranley. Indeed, no document similar to this combined arrest warrant and conditional bond order has any legal precedent that I can find, and the government has cited to none. It is unfortunately unique and should not be repeated. In short, nothing in our precedent would make it unreasonable for Swanson to fear that he would be denied bond if he exercised his Fifth Amendment rights instead of admitting the location of the other firearms.
Swanson was placed in a troubling position. Although he was not exposed to what the Supreme Court calls “the cruel trilemma of self-accusation, perjury or contempt,” Michigan v. Tucker, 417 U.S. 433, 444-45, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), he was forced to choose between self-incrimination, a potential obstruction of justice charge since he was not under oath at the time, or being denied bond for a misdemeanor offense. In other words, he was forced to either sacrifice his Fifth Amendment rights or forego bond and wait in jail for the matter to be sorted out, which could take some time. The fact that he faced such a threat and ceded to it means his statements were compelled and should have been suppressed. For that reason I believe this falls within the penalty exception.
Thus, I respectfully concur with the court’s decision that the firearm and Swanson’s statements should have been suppressed.

. See Lefkowitz v. Cunningham, 431 U.S. 801, 804-05, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); see also Uniformed Sanitation Men Ass’n v. Comm’r of Sanitation, 392 U.S. 280, 283-84, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (finding Fifth Amendment violation when city employees were discharged for invoking Fifth Amendment privilege against self-incrimination); Gardner v. Broderick, 392 U.S. 273, 279, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (finding Fifth Amendment violation when police officer was threatened with and subsequently discharged from employment if he did not waive his Fifth Amendment immunity in conjunction with a grand jury investigation); Garrity v. New Jersey, 385 U.S. 493, 497, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (finding Fifth Amendment violation when police officers gave coerced confessions under threat of discharge).

. It is unclear from the bond order or the briefs who would make the determination of whether Swanson had complied. Naturally, it makes sense that a magistrate or judge would make that determination but such a finding would rely heavily on Sgt. Ford’s investigation and statement on the issue. Indeed, the government concedes in its brief that had Swanson said nothing more, Sgt. Ford would have assumed he fully complied and Swanson could have posted bond. So, Sgt. Ford’s impression was critical to Swanson receiving bond.